# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

AMY FEIGE,

       Plaintiff,

v.                                                    Case No.   3:19-cv-395-MMH-MCR

NOVITAS SOLUTIONS, INC.,

       Defendant.

_____

# <u>O R D E R</u>

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment (Doc. 38; Motion), filed on January 19, 2021, by Defendant Novitas Solutions, Inc. (Novitas).[1]  Plaintiff Amy Feige filed a response to the Motion on March 2, 2021.  <u>See</u> Plaintiff's Response and Objection to Defendant's Motion for Summary Judgment (Doc. 49; Response).  Accordingly, this matter is ripe for review.

---

[1]     That same day, Feige filed Plaintiff's Motion for Summary Judgment on Count I of Plaintiff's Complaint, Statement of Undisputed Material Facts and Incorporated Memorandum of Law (Doc. 37; Plaintiff's Motion).  Novitas responded to Plaintiff's Motion on March 2, 2021.  <u>See</u> Defendant's Response in Opposition to Plaintiff's Motion (Doc. 47; Novitas' Response).  As discussed in more detail below, the Court denied Plaintiff's Motion at an August 24, 2021 hearing on the parties' cross-motions for summary judgment.  <u>See</u> Clerk's Minutes (Doc. 61; Motion Hearing).  Nevertheless, in ruling on the instant Motion, the Court considers all the arguments the parties set forth in their respective briefs and those made during the Motion Hearing.

## I.  **Standard of Review**

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[2]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting

---

[2]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."  United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).   "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."   Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

A party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.   See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).   "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."   Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted).   Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case.").   In determining whether summary judgment is appropriate, a court "must view all

evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).   Nevertheless, "[a] district court should grant summary judgment when, 'after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case.'" Ireland v. Prummell, 53 F.4th 1274, 1286 (11th Cir. 2022).

## II.   **Background**[3]

Novitas operates as a government contractor for the Centers for Medicare & Medicaid Services (CMS).   See Declaration of Heather Owen (Doc. 39-16; Owen Dec'l) ¶ 15.   In this capacity, Novitas is privy to various forms of confidential patient Protected Health Information (PHI) and Personally Identifiable Information (PII).   See Videotaped Deposition of Amy Elizabeth Feige (Doc. 39-1; Feige Dep.) at 13, 114-115; Feige Dep. Ex. 1 (Doc. 39-2 at 1-9; Termination Letter); see also Feige Dep. Exs. 8, 11 (Doc. 39-2 at 25-29). Accordingly, Novitas maintains company policies restricting the exchange of such information to ensure its confidentiality.   See Feige Dep. at 13, 114-115;

---

[3]   The facts recited in this section are either undisputed, or any disagreement has been indicated.   Because this matter is before the Court on Novitas' Motion, the Court views the facts, and all reasonable inferences drawn therefrom, in the light most favorable to Feige, the non-moving party.   See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

Feige Dep. Exs. 8, 11 (Doc. 39-2 at 25-29); see also Termination Letter.   Among other things, Novitas' policies prohibit employees from sending or forwarding emails containing PHI or PII to a non-company email account without approval and authorization, and also prohibit employees from storing such information on a personally-owned device.   See Feige Dep. Ex. 11 (Doc. 39-2 at 28-29).   As a government contractor with CMS, in the event of a suspected violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or an information security breach, Novitas is required to file an initial incident report within hours of discovery.   See Owen Dec'l ¶ 15.   Additionally, Novitas is required to investigate and report any actual or potential disclosure of PHI or PII to CMS within forty days of a reported incident.   See Termination Letter; see also Deposition of Jamillah Marena Haynes (Doc. 39-12; Haynes Dep.) at 16-17.

Feige began her employment at Novitas as a Nurse Analyst in January of 2015.   See Feige Dep. at 94, Ex. 6 (Doc. 39-2, at 23); see also Plaintiff's Motion ¶ 1; Declaration of Amy Feige (Doc. 49-1; 1/18 Feige Dec'l) ¶ 6.   At first, Feige "telecommuted," i.e., she worked from home one or two days a week but travelled to work for the rest of the week.   See Feige Dep. at 94-95.   Feige's duties at Novitas primarily consisted of reviewing Medicare "Part A" hospital claims to determine whether a patient's surgery was medically necessary or elective.   Feige Dep. at 47-48.   At times, Feige also handled Medicare "Part B"

claims, which required her to review documentation related to outpatient healthcare visits and treatments from healthcare providers.   Id. at 128-29; Declaration of Janice Carter (Doc. 39-15; Carter Dec'l) ¶¶ 4-5, 9.   Throughout her tenure at Novitas, Feige reported to Janice Carter.   See Deposition of Janice Carter, December 9, 2020 (Doc. 37-3; Carter Dep.) at 22.   During her employment, Feige received training on Novitas' company policies regarding PHI and PII, and during a deposition taken in this case testified to her familiarity with such policies.   See Feige Dep. at 13, 98, 114-15.[4]

Feige took FMLA leave for the first time in early 2016, see Feige Dep. at 80, from April 16, 2016 until May 2, 2016, see Feige Dep. at 83; Ex. 4 (Doc. 39-2, at 15).   Shortly after her return from this FMLA leave, she transitioned to a full-time teleworker.[5]   See id. at 94-96.   Feige then took an unplanned but approved FMLA leave from February 27, 2017, to April 10, 2017.   See Feige Dep. at 83; Ex. 4 (Doc. 39-2, at 15).   She took her third FMLA leave from August 28, 2017, through September 12, 2017.[6]   See id.   In November of 2017,

---

[4]     Feige also testified that she "understood as a nurse working for Novitas that there were federal laws that required the safekeeping of all personal identifying information."   Feige Dep. at 114.

[5]     It appears that Feige requested the change from part-time to full-time telework, which Novitas approved effective May 12, 2016.   See Feige Dep. Ex. 7 (Doc. 39-2 at 24); see also Carter Dep. at 14.   Notably, during her deposition, Feige testified she understood that as a teleworker she would be subject to stricter company policies regarding protected information.   Feige Dep. at 96.

[6]     The parties offer conflicting accounts as to the date this FMLA leave period ended; in Novitas' answers to interrogatories and in the Motion, Novitas represents that Feige's leave ended September 13, 2017.   In contrast, Feige represents in

Carter counseled Feige regarding her transmission of patient information to her personal e-mail in violation of Novitas' policies.   <u>See</u> Carter Dep. at 43; <u>see also</u> Feige Dep. at 19-20.   Feige later testified that she understood that her actions violated company policy, and that at the time she agreed not to do it again.   <u>See</u> Feige Dep. at 20-21.

While working at Novitas, Feige became friends with co-worker Kathleen McCarty.   <u>See</u> Feige Dep. at 40; <u>see also</u> Deposition of Kathleen Jean McCarty, December 16, 2020 (Doc. 37-5; McCarty Dep.) at 23, 45, 53.   During Feige's first three FMLA leaves, she and McCarty frequently communicated via telephone and text message concerning both personal and work matters.[7]   <u>See</u> McCarty Dep. at 30-31; <u>see generally</u> Feige Dep. Exs. 2, 19, and 20 (Docs. 39-3, 39-4, 39-5, 39-6, 39-7, 39-8).   On various occasions during the course of their communications, McCarty sought assistance from and asked work-related questions of Feige.[8]   <u>See, e.g.,</u> Feige Dep. Ex. 19(c) (Doc. 39-6; August 2017 to

---

Plaintiff's Motion and in her first declaration (1/18 Feige Dec'l, ¶ 13) that this leave period ended on September 12, 2017.   Although Feige's claims in this action relate to this period of FMLA leave, the exact date she returned from leave is not material to the resolution of the issues presented in the Motion, and the Court accepts the date proffered by Feige, the non-moving party.

[7]   Because Feige's claims in this action pertain only to her FMLA leave from August 28, 2017 through September 12, 2017, the Court will limit the recitation of facts to those relevant to this FMLA leave period.   <u>See</u> Complaint ¶ 20.

[8]   In the instant action, Feige maintains that such requests constitute interference under the FMLA.   <u>See</u> Complaint ¶ 20; <u>see also</u> Feige Dep. at 166-167; Plaintiff's Motion at 8; 1/18 Feige Dec'l ¶ 18.   Notably, the parties dispute the extent of the communications and whether Feige consented to or even invited the work-related communications.   <u>Compare</u> 1/18 Feige Dec'l ¶¶ 18-25, <u>with</u> McCarty Dep. at 30, 41.

September 2017 Redacted Extraction Report); (Doc. 62; August 2017 to September 2017 Unredacted Extraction Report); see also Feige Dep. at 134-136; McCarty Dep. at 30.   Additionally, while Feige was on FMLA leave, Carter contacted her to ask whether McCarty could seek work-related assistance from Feige concerning Medicare "Part A" claims.[9]   See Carter Dep. at 27, 40; see also McCarty Dep. at 24-25, 30, 42.   According to McCarty, this was because Feige had the necessary Medicare "Part A" training.   See McCarty Dep. at 23-24. McCarty described Feige's "Part A" assistance as helpful.   Id. at 24.   When Carter contacted Feige, Feige gave her the name of another employee who could assist with "Part A" claims.   See Carter Dep. at 28, 40-41; see also 1/18 Feige Dec'l ¶¶ 19, 23; February 2017 to April 2017 Extraction Report at 67.   Carter testified that, as Feige requested, she directed McCarty to contact this other employee for further assistance with "Part A" claims.   See Carter Dep. at 28.

---

For purposes of resolving the Motion, the Court accepts Feige's position that communications were both frequent and not voluntary.

[9]      The parties dispute the timing of Carter's contact; while Feige maintains that it occurred during the August–September 2017 leave period, Carter testified that she recalled the communication to have occurred "around April, May."   Compare 1/18 Feige Dec'l ¶ 17, 23, with Carter Dep. at 27, 40.   The Court notes that a forensic transcript of Feige's text messages reflects that on February 28, 2017, Carter asked Feige "[w]ill [McCarty] be able to reach out to you? [h]ow long will you be out?"   See Extraction Report (Doc. 39-16 at 11-85; February 2017 to April 2017 Extraction Report) at 73.   Feige responded "[p]rob [sic] 3-4 days. [o]f course. [w]ill let Matt know."   Id. Additionally, this transcript reflects that on March 6, 2017, Carter asked Feige if McCarty could contact her for assistance with "transplant cases."   Id. at 67. Relatedly, the parties dispute whether Carter encouraged McCarty to contact Feige. Compare 1/18 Feige Dec'l ¶ 23, with McCarty Dep. at 25, 42.

McCarty resigned her employment with Novitas on December 13, 2017.   See Carter Dec'l ¶ 11; c.f McCarty Dep. at 18 (testifying that she thought her employment with Novitas ended in November of 2017).

Feige subsequently took FMLA leave during the period of December 20, 2017, through January 17, 2018, intermittent FMLA leave from May 1, 2018, through November 1, 2018, continuous FMLA leave from June 22, 2018, through July 18, 2018, and continuous FMLA leave from September 24, 2018, through October 30, 2018.[10]   Feige Dep. at 83; Ex. 4 (Doc. 39-2, at 15).   At this point, Feige had exhausted her FMLA leave, but Novitas placed her on short-term disability which continued until her February 28, 2019 termination.   Id.; see also Owen Dec'l ¶¶ 6-7; Feige Dep. at 148; Motion at 4, n.28 (describing Feige's exhaustion of available FMLA leave).[11]

On or about July 23, 2018, while Feige was on FMLA leave, Novitas

---

[10]   Feige's claims in this action relate solely to her FMLA leave from August 28, 2017, through September 12, 2017.   See Complaint ¶ 20.

[11]   For clarity, following is a summary of Feige's seven FMLA-leave periods:
- April 16, 2016—May 28, 2016 (bariatric surgery)
- February 27, 2017—April 10, 2017
- August 28, 2017—September 13, 2017
- December 20, 2017—January 17, 2018
- May 1, 2018—November 1, 2018 (intermittent)
- June 22, 2018—July 18, 2018 (continuous)
- September 24, 2018—October 30, 2018 (continuous)

Novitas approved each of Feige's seven FMLA-leave requests during her employment, and Feige was not permitted to return to work until cleared to do so by her doctor. See Feige Dep. at 84; see also Owen Dec'l ¶ 8.

received a letter from an attorney representing Feige complaining that Novitas had improperly required Feige to work from home during her previous periods of FMLA leave.   See Feige Dep. Ex. 5 (Doc. 39-2, at 21-22; July 23 Letter); see also Owen Dec'l ¶ 9.   This letter prompted Heather Owen, Assistant General Counsel for Diversified Services Options, Inc. (Novitas' parent company), to investigate Feige's complaints.   Owen Dec'l ¶¶ 2-3, 10.   As part of her investigation, Owen reviewed FMLA documentation, internal communications, emails, phone records, time records, and other documents.   See id. ¶ 11.   She found no evidence that Feige had been required to work while on FMLA leave or was otherwise treated improperly and responded to Feige's counsel expressing this conclusion.   See id.; see also Owen Dec'l Ex. A (Doc. 39-16 at 5-9).   In responding to the July 23 Letter, Owen invited Feige's counsel to provide the "emails, call logs and text messages which support Ms. Feige's claims." Owen Dec'l ¶ 11; Owen Dec'l Ex. A (Doc. 39-16 at 5-9).

Nearly six months later, on February 7, 2019, Owen received from Feige's counsel what she describes as "an incomplete transcript of text messages" exchanged between Feige and McCarty during the time period of March 30, 2016, through September 4, 2018.   Owen Dec'l ¶ 13.   Owen began reviewing the transcript on February 12, 2019.   Id. ¶¶ 13-14.   As she reviewed the messages, Owen saw that the text messages–exchanged on Feige and McCarty's personal cell phones—contained patient information that likely constituted

confidential and protected information.  Id. ¶¶ 13-14.  Owen's review of these text messages marked the first time Novitas had knowledge of the contents of the text messages exchanged between Feige and McCarty.[12]  See id.  Pursuant to Novitas' obligations[13] as a government contractor for CMS, Owen promptly reported the suspected breach to Novitas' Chief Compliance Officer, and contacted Novitas' System Security and Compliance departments to begin a separate report and investigation into the potential violation of Novitas' protected patient information policies.  Id. at ¶¶ 14-16.

As part of its mandatory disclosure investigation, on February 20, 2019, Jamillah Haynes, Employee Relations Consultant for Diversified Services Options, Inc., and LaWanda Gray, Novitas' Senior Privacy Consultant, contacted Feige by telephone asking to schedule an interview to discuss the security incident report.  See Feige Dep. Ex. 3 (Doc. 39-2) at 10; see also Haynes Dep. at 9-11, 13; Declaration of Jamillah Haynes (Doc. 39-17; Haynes

---

[12]   While the record reflects that Carter knew that McCarty had contacted Feige on at least one occasion during Feige's FMLA leave, and that Carter informed her supervisor Jessica Hicks of the contact, nothing in the record supports even an inference that Carter or anyone else at Novitas knew of the contents of the communications until Owen reviewed the incomplete transcript from Feige's counsel. See Carter Dep. at 28-30, 33, 38-40, 56-57; see also McCarty Dep. at 24, 48; Deposition of Jessica Lynn Hicks (Doc. 39-11; Hicks Dep.) at 26-29.

[13]   As noted above, these requirements include filing an initial incident report for any suspected HIPAA or information security breaches within hours of discovery, Owen Dec'l ¶ 15, and investigating and reporting any actual or potential disclosure of PHI to CMS within forty days of an incident report, see id. ¶ 16; Termination Letter; see also Haynes Dep. at 16-17.

Dec'l) ¶¶ 2, 3, 5; Termination Letter.  During the call, Haynes and Gray reminded Feige that she was required to participate in the investigation, and Feige identified February 22, at 1:00 p.m., as an agreeable time to meet.  See Haynes Dep. at 10; see also Haynes Dec'l ¶ 6; Termination Letter.  However, when Haynes and Gray attempted to reach Feige at the designated time, Feige said she could not hear the participants and the call disconnected.  See Haynes Dep. at 10; Haynes Dec'l ¶ 7; Termination Letter.  Haynes and Gray then attempted several additional calls to Feige's phone and left a voicemail providing a number for Feige to return their calls.  See Haynes Dep. at 10-11; Haynes Dec'l ¶ 8; Termination Letter.  After the failed attempts to contact Feige via telephone, Haynes sent Feige an email and an identical overnight letter rescheduling the meeting for February 25, 2019, and again reminding Feige that her participation in the investigation was mandatory.  See Haynes Dec'l ¶ 9; see also Haynes Dec'l Ex. A (Doc. 39-17 at 3-5).  Additionally, in the email and letter, Haynes requested that Feige provide documentation of all text messages between her and McCarty, including attachments, photos, screenshots, and Feige's side of the conversation—which had been omitted from the transcript sent by Feige's counsel to Owen.  See Haynes Dec'l Ex. A (Doc. 39-17 at 3-5).  On February 25, 2019, just before the scheduled meeting, Feige emailed Haynes and stated the following:

>Hi Jamillah, I apologize for not being able to answer the phone Friday, I was on my way to the Dr. and my phone died.
>
>As for the letter I received today, my lawyer has already explained that they've already turned over the responsive messages in their pos[s]ession.
>
>I feel I'm being retaliated against for exerting my FMLA rights. I am requesting that the retaliation stop immediately. I am forwarding the email that my lawyer sent to the Novitas lawyer in February.
>
>Thanks
>Amy Feige

Feige Dep. Ex. 3 (Doc. 39-2 at 10; February 25 Email).   Haynes and Gray provided Feige with yet another opportunity to participate in the investigation by permitting Feige to contact them by 10:00 a.m. the following day, February 26, 2019.  See Haynes Dep. at 11; Termination Letter.  Feige did not do so. See Haynes Dep. at 11; Termination Letter.

On February 28, 2019, Novitas terminated Feige.  See Feige Dep. at 10-11; see also Termination Letter.   When asked what she remembered about that day, Feige responded:

>Just that I was home, and I believe Jamillah called me and was telling me about -- I can't recall verbatim, but she was telling me about they had thought I had did something I shouldn't as far as texting back and forth with my workmate, who was also my best friend. And that I had a choice. I could either quit or be fired.

Feige Dep. at 10.   In the Termination Letter, Novitas detailed Feige's offending conduct and explained that her termination was due to: 1) her unsecure exchange of voluminous text messages containing confidential company and Medicare patient information using her personal cell phone; 2) her

unauthorized access of company information; 3) her refusal to participate in the required "System Security Investigation" and related refusal to provide an export of the offending text messages from her personal cell phone; 4) her failure to stop McCarty from sending the improper text messages and failure to report the text messages pursuant to company policy; and 5) her unencrypted disclosure of the text messages to an unauthorized third party who again transmitted the text messages to another party.[14]   See Termination Letter.

## III.   **Procedural History**

On April 5, 2019, Feige initiated this action by filing her Complaint and Demand for Jury Trial (Doc. 1; Complaint).[15]   In the Complaint, Feige alleges that Novitas interfered with her FMLA rights and retaliated against her based on her exercise and assertion of such rights.   See generally id.   Specifically, as to the interference claim, Feige asserts that "[d]uring what should have been FMLA protected leave from August 28, 2017, through September 12, 2017, Defendant required Ms. Feige to work while she should have had the

---

[14]     Novitas additionally explained in the Termination Letter that this conduct was "in violation of CMS's requirements, [Novitas'] Code of Business Conduct, the Rules of Behavior, and [Novitas] Policy 1.20 Compliance and Ethics, and [Novitas] Policy 5.50, Confidential and Proprietary Information. . . ."   See Termination Letter.

[15]     The Court notes that the Complaint lacks enumerated counts.   See generally Complaint.   Instead, the Complaint has a single header entitled "Unlawful Interference and Retaliation Under the FMLA," under which Feige asserts that Novitas "interfered with and retaliated against [her] based upon [her] exercise/assertion of her FMLA rights."   Complaint ¶ 38.   As discussed during the Motion Hearing, the two claims, interference and retaliation, should have been pled in separate counts as separate claims.

undeterred opportunity to recover from her surgery." Id. ¶ 20.   Additionally, she alleges that she objected to this work requirement and expressed to Novitas that her "strained work environment and job duties interfered with her ability to heal/recover properly and efficiently." Id. ¶ 21.   She also contends that Novitas' interference caused her "great distress, prejudice, and reluctance to utilize FMLA leave in the future." Id. ¶ 23.   Feige asserts a separate claim of retaliation stating that after her counsel sent Novitas the July 23 Letter, and after her exercise of her right to FMLA-leave, Novitas retaliated against her by terminating her employment.[16] Id. ¶¶ 25-30.

Novitas answered the Complaint on May 6, 2019, asserting a number of affirmative defenses.   See generally Defendant's Answer and Affirmative Defenses (Doc. 5).   After engaging in discovery, the parties filed cross motions for summary judgment on January 19, 2021.   See Plaintiff's Motion; see also Motion.   Then, after obtaining an extension of time to file responsive briefs, the parties filed their respective responses on March 2, 2021.   See Endorsed Order (Doc. 46), entered on February 23, 2021; see also Novitas Response; Response.

In Plaintiff's Motion, Feige sought partial summary judgment as to her claim that Novitas interfered with her rights under the FMLA.   See generally

---

[16]   During the Motion Hearing, Feige's counsel confirmed that the only adverse action serving as the basis for her retaliation claim is her termination from Novitas in February of 2019.

Plaintiff's Motion.   In its Motion, Novitas sought entry of summary judgment in its favor on both Feige's claims for FMLA interference and FMLA retaliation. <u>See</u> Motion at 1, 13, 25.   After the parties fully briefed their cross-motions for summary judgment, the Court held a hearing on the motions at which counsel presented lengthy arguments in support of their respective positions.   <u>See</u> Clerk's Minutes (Doc. 61; Motion Hearing).   At the Motion Hearing, the Court concluded that the record presents genuine issues of material fact as to the following questions in this case: the nature, extent, and frequency of Novitas' employees' communications with Feige while she was on FMLA leave; whether Feige consented to or voluntarily engaged in such communications; and the extent to which Novitas authorized any such communications.   <u>Id.</u>  Because these issues of fact precluded entry of summary judgment in Feige's favor on her interference claim, the Court denied Plaintiff's Motion.[17]   <u>Id.</u>   With regard to Novitas' Motion, the Court found that the same genuine issues of material fact precluded the Court's acceptance of Novitas' argument that Feige voluntarily engaged in work-related communications with McCarty while on FMLA leave.   However, as the Court explained on the record, in its Motion Novitas raised additional arguments not tethered to these disputed issues of

---

[17]   Notably, Feige's counsel conceded during the Motion Hearing that such issues of fact precluded the Court from granting Plaintiff's Motion, but went on to argue that both cross-motions should be denied.

fact.   See generally Motion.   After hearing from counsel on these arguments, the Court took the remainder of Novitas' Motion under advisement.   In this Order, the Court addresses those remaining arguments.

## IV.   <u>Applicable Law</u>

"The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"   <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)) (alteration in <u>Hurlbert</u>).   "[L]eave for a serious health condition need not be taken as a 12-week block but rather may be taken 'intermittently or on a reduced leave schedule when medically necessary.'"   <u>Strickland v. Water Works & Sewer Bd. of Birmingham</u>, 239 F.3d 1199, 1204 n.4 (11th Cir. 2001) (quoting 29 U.S.C. § 2612(b)(1)).   In addition, the FMLA grants an eligible employee who takes leave under the FMLA the right, upon returning from such leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position.   29 U.S.C. § 2614(a)(1).   In recognition of these rights, the FMLA further "creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights."   <u>Hurlbert</u>, 439 F.3d at 1293

(quotation omitted).   The Eleventh Circuit Court of Appeals has recognized two types of claims arising under the FMLA: "'interference claims, in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act, and retaliation claims, in which an employee asserts that [her] employer discriminated against [her] because [s]he engaged in activity protected by the Act.'"   Id. (citation omitted).

### A. FMLA Interference

"To prove FMLA interference, an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA."   Martin v. Brevard Cnty. Public Schools, 543 F.3d 1261, 1266-67 (11th Cir. 2008) (per curiam); see also Hurlbert, 439 F.3d at 1293 ("To establish an interference claim, 'an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied.'") (quotation omitted).   Thus, to prevail on an interference claim, the employee must show that she "(1) was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit."   White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015) (citing Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010)).   Additionally, the employee must show "that she 'has been prejudiced by the violation in some way.'"   Evans v. Books-A-Million, 762 F.3d 1288, 1295 (11th Cir. 2014) (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)).   The employee does not have to prove "that [her] employer intended to

deny the benefit, because 'the employer's motives are irrelevant.'" Krutzig, 602 F.3d at 1235 (quoting Strickland, 239 F.3d at 1208).

## B. **FMLA Retaliation**

"[T]o succeed on a retaliation claim, an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." Strickland, 239 F.3d at 1207.   "Essentially, [Feige] must show that she suffered an adverse employment action that was 'motivated by an impermissible retaliatory or discriminatory animus.'" See Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010) (quoting Strickland, 239 F.3d at 1207).   When a plaintiff asserts a claim of retaliation under the FMLA based on a single-motive theory and relying on circumstantial evidence, as Feige does in this case,[18] courts apply the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for Title VII discrimination claims.   See Schaaf, 602 F.3d at 1243; see also Bartels v. So. Motors of Savannah, Inc., 681 F. App'x 834, 837 (11th Cir. 2017).

---

[18]     Feige does not argue that she has direct evidence of unlawful intent, nor does she contend that Novitas had mixed-motives in terminating her employment.   See Response at 2 (asserting that Plaintiff was "promptly and unlawfully terminated as a result of exercising her FMLA rights"); id. at 17 (relying on the McDonnell Douglas framework).

Under this framework, "[a] prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." <u>Krutzig</u>, 602 F.3d at 1234. "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" <u>Id.</u> (quoting <u>Brungart v. BellSouth Telecomms., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000)). Once an employee establishes a prima facie case of retaliation, "the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" <u>Martin</u>, 543 F.3d at 1268 (quoting <u>Hurlbert</u>, 439 F.3d at 1297). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" <u>Id.</u> (quoting <u>Hurlbert</u>, 439 F.3d at 1298).

## V. <u>Discussion</u>

In the Motion, Novitas seeks entry of summary judgment in its favor on both claims set forth in Feige's Complaint—FMLA interference and retaliation. <u>See</u> Motion at 1, 13, 25. The Court addresses the interference claim first then turns to Feige's retaliation claim.

### A. **FMLA Interference**

Feige maintains that Novitas' interference with her FMLA rights consisted of "daily, if not multiple times daily, text messages and emails from [McCarty] requesting assistance with work-related assignments, case work, and daily case load while Plaintiff was on what should have been FMLA-protected leave," and that such communications far exceeded the de minimis communications permissible under the FMLA.  See Plaintiff's Motion at 8 (citing Feige Dep. at 134).  Additionally, Feige asserts that Carter authorized McCarty to contact her for work-related assistance despite Feige's instruction to the contrary.  See Plaintiff's Motion at 8-9; see also 1/18 Feige Dec'l ¶ 23.[19]

In its Motion, Novitas generally contended that McCarty's communications to Feige did not constitute interference and that she did not suffer any prejudice from such communications.  Motion at 21-22.  According to Novitas, Feige voluntarily participated in any work-related communications that occurred while she was on FMLA leave—and voluntary work (even while

---

[19]   The Court notes that in Plaintiff's Motion, Feige seemingly asserted—for the first time—an alternate ground for her interference claim, namely, that Novitas failed to provide her with the "necessary and proper FMLA documentation" when she sought to take FMLA leave.  See Plaintiff's Motion at 10.  However, during the Motion Hearing, Feige's counsel clarified that this assertion was not intended to constitute an additional claim; rather, it was meant to serve only as additional evidence that Novitas intended to dissuade Feige from taking FMLA leave.

on FMLA leave) is not actionable.[20]   See id. at 21-25.   Based on this proposition, Novitas asserted that "there is no evidence that responding to McCarty's questions while on FMLA leave was a condition of Feige's employment or that Feige's responses agreeing to assist McCarty were 'coerced' by Novitas or involuntary in any way."   Id.   Similarly, Novitas argued that Feige failed to complain to anyone at Novitas about McCarty's communications, and instead "simply told Carter that she needed to find people to assist McCarty with the Part A work."   Id. (citing Feige Dep. at 51).   Novitas pointed to several portions of the record that it believed "indicate[ ] that Feige voluntarily chose to answer [McCarty's questions] . . ."   Id. at 24.   While Novitas is correct that some record evidence suggests that Feige may have voluntarily engaged in work-related communications with McCarty, for the reasons discussed during the Motion Hearing, Feige's representations in her declarations constitute evidence that she did not voluntarily engage in work-related communications during the relevant FMLA leave period.[21]   For this reason, at the Motion

---

[20]     In support, Novitas has cited several cases which suggest that a plaintiff's voluntary work-related actions while on FMLA leave do not amount to actionable interference.   Id. at 23 (collecting cases).

[21]     Specifically, Feige declares that she "informed both Carter and McCarty that [such communications were] unacceptable" (1/18 Feige Dec'l ¶ 25); that she "did not authorize McCarty during leave [sic] but instead, [she] directed Carter to seek assistance elsewhere and advised Carte[r] that additional cross-training of employees in both Medicare Part A and Medicare Part B was imperative" (¶ 19); that "'once or twice' [she] declined McCarty assistance [sic], informed McCarty to find someone else to assist her and complained to McCarty about being required to work while on . . . FMLA leave" (¶ 20); that she "sent multiple texts telling [McCarty] to tell [Carter] to

Hearing, the Court concluded that genuine disputes of material fact exist as to the nature, extent, and frequency of Novitas-employee communication with Feige while she took FMLA leave; whether Feige consented to or voluntarily engaged in any such communication; and the extent to which Novitas authorized any such communication.  See id.  Therefore, issues of fact remain on the question of whether Novitas interfered with Feige's FMLA leave by requiring her to work.  Novitas' arguments to the contrary ask the Court to accept its view of the facts, and as such, are simply unavailing in the context of a motion for summary judgment.   Nonetheless, upon consideration of the other arguments raised by the parties in their filings and discussed during the Motion Hearing, as well as a review of relevant case law and the record in this case, the Court concludes that Feige has failed to demonstrate that she suffered prejudice or incurred any cognizable damages under the FMLA, and for this reason, Novitas' Motion is due to be granted as to Feige's interference claim—despite the issues of fact as to Novitas' interference.

The Court turns to those other arguments here.   Novitas contends that, even assuming Novitas employees contacted Feige without her consent in a

---

find somebody to help her" (¶ 21); that she "informed [McCarty] that she should not be helping or did not want to help [sic] with work-related tasks, assignments and daily workload during her [sic] FMLA-protected leave" (¶ 22); and that she "never authorized to [sic] McCarty or anyone else to contact [her] while on FMLA leave to work or for assistance with work-related matters" (¶ 24).

manner that could constitute interference under the FMLA, she has failed to demonstrate that she suffered actual prejudice as a result of any such interference.   See Defendant's Response at 15-17.   In support of this contention, Novitas cites an opinion by another jurist of this court, Conage v. Web.com Grp., Inc., No. 3:19-CV-87-J-32JRK, 2020 WL 7385326, at *1 (M.D. Fla. Dec. 16, 2020).   In Conage, the plaintiff was employed by Web.com for several years.   Id. at *1.   At various times during her employment, Conage requested continuous or intermittent FMLA leave—and each time Web.com approved her request.   Id. at *2-4.   However, on at least one occasion, Conage's manager contacted her to express discontent with the manner in which she used her FMLA leave.   Id. at *3.   Later, after disputes with Web.com concerning her pay and bonuses, Conage resigned, citing unfair treatment as a result of taking FMLA leave and fear that her health would be put in jeopardy if she remained employed there.   Id. at *4.   Conage then filed suit alleging that Web.com had interfered with her FMLA rights by discouraging her from taking FMLA leave.   See id. at *5-6.   Web.com moved for summary judgment, arguing that it did not interfere with Conage's FMLA rights because it approved all of her requested leave.   Id. at *1.   After careful review of the record, the court recognized that "a jury could reasonably conclude that Web.com discouraged Conage from taking FMLA leave."   Id. at *6.   Nonetheless, the court granted summary judgment in favor of Web.com on Conage's interference

claim because she had "not articulated that she suffered any prejudice or recoverable damages from Web.com's interference with her FMLA leave." Id. In doing so, the court explained that to prevail on an FMLA interference claim, in addition to demonstrating an entitlement to a benefit denied by the employer,

> a plaintiff must demonstrate some harm remediable by either damages or equitable relief, the two distinct categories of remedies provided for by the FMLA. Damages can include not only wages, salary, employment benefits, or other compensation denied or lost to [an] employee by reason of the violation, but also, in cases where those forms of compensation have not been denied or lost, any actual monetary losses sustained by the employee as a direct result of the violation. Equitable relief can include "employment, reinstatement, and promotion."

Id. at *5 (quoting Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 592-93 (11th Cir. 2017), and citing Jones v. Children's Hosp., 58 F. Supp. 3d 656, 669 (E.D. La. 2014)). Further, in determining that no reasonable jury could conclude that Web.com's interference prejudiced Conage, the court gave examples of shortcomings in Conage's case—namely, that she failed to allege that she incurred any expenses as a result of her employer's alleged interference or that her employer prevented her from attending doctor visits. Id. Additionally, the court highlighted the fact that Web.com ultimately approved all the leave Conage requested. Id. (citing Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1275 (11th Cir. 1999); Juback v. Michaels Stores, Inc., 143 F. Supp. 3d 1195, 1211 (M.D. Fla. 2015); and Mays v. Bd. of Comm'rs Port of New Orleans, No. 14-1014, 2015 WL 6605545, at *15 (E.D. La. Oct. 29, 2015)).

Here, Feige's claim suffers from similar shortcomings. While a reasonable jury might conclude that Novitas interfered with Feige's FMLA leave, no reasonable jury could find that Feige suffered any actionable prejudice or incurred damages as a result of Novitas' actions. See Conage, 2020 WL 7385326, at *5-6 (citing Diamond, 677 F. App'x at 592). Feige has not presented any evidence that she lost benefits or incurred any monetary loss as a result of Novitas' alleged interference. Indeed, when asked whether she lost any benefits as a result of her communications with McCarty while on FMLA leave, Feige testified that she was unaware of any. See Feige Dep. at 75. Although Feige testified that she thought that Novitas' alleged interference slowed her recovery by inhibiting her ability to rest,[22] see Feige Dep. at 74-76, she pointed to no evidence in support of this contention.[23] Moreover, in the context of an FMLA interference claim, a plaintiff's allegedly slowed recovery, in the absence of related medical bills, costs, or the like, is simply insufficient. See Conage, 2020 WL 7385326, at *5 (citing Frizzell v. Delta Air Lines, Inc., No.

---

[22] Notably, although Feige testified that she thought her communications with McCarty slowed her recovery, see Feige Dep. at 74-75, she offers no evidence how such an effect was a result of Novitas' interference, and neither of Feige's declarations address damages. See generally 1/18 Feige Dec'l; 3/2 Feige Dec'l.

[23] Indeed, Feige's counsel conceded during the Motion Hearing that the record is devoid of evidence that Novitas' alleged interference resulted in a slowing of her recovery. To avert entry of summary judgment, Feige bore the burden to "either point to evidence in the record or present additional evidence sufficient to withstand a [judgment as a matter of law] motion at trial based on the evidentiary deficiency." Ireland, 53 F.4th at 1286.

1:19-CV-1573-TWT-JSA, 2019 WL 5459074, at *9 (N.D. Ga. Aug. 29, 2019) (discussing the limited types of actionable damages provided for by the FMLA, which consist of actual damages, liquidated damages, equitable relief, and fees and costs). Further, to the extent that Feige maintains that she and/or her husband experienced mental distress, see Complaint ¶ 23; 1/18 Feige Dec'l ¶ 26; 3/2 Feige Dec'l ¶¶ 26-27, the FMLA does not permit plaintiffs to recover damages for mental or emotional distress. Conage, 2020 WL 7385326. Feige has also failed to present any evidence that she was denied the benefit of subsequent FMLA leave—indeed, as was the case in Conage, Feige concedes that Novitas approved all of her FMLA leave requests.[24] Feige Dep. at 84; see Conage, 2020 WL 7385326, at *6. Notably, even after Novitas allegedly interfered with Feige's August through September of 2017 FMLA leave, Feige took four additional approved FMLA leaves. See Feige Dep. at 83; Ex. 4 (Doc. 39-2, at 15).[25] Thus, for purposes of her FMLA interference claim, Feige has

---

[24]    During the Motion Hearing, Feige argued that she attempted to return to work early as a result of the alleged interference and that taken collectively, the record shows she cut short her recovery period. However, Feige has set forth no evidence supporting even an inference that she sought to return to work early because of Novitas' alleged interference. A mere scintilla of evidence will not defeat a properly supported motion for summary judgment. Ireland, 53 F.4th at 1286 (quoting Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004)).

[25]    To the extent that Feige maintains that her termination in February of 2019 constitutes interference, the Court notes that she had exhausted her statutory FMLA leave well in advance of her termination, thus her termination is not grounds for her interference claim. See Penaloza v. Target Corp., 549 F. App'x 844, 848 (11th Cir. 2013) ("As to interference, Target gave Ms. Penaloza over 12 weeks of leave before her termination. She was terminated two weeks after her 12–week leave period ended.

failed to present any evidence that she suffered recoverable damages as a result of Novitas' alleged interference.   See id. (citing <u>Demers v. Adams Homes of Nw. Fla., Inc.</u>, 321 F. App'x 847, 849 (11th Cir. 2009); and <u>Drago v. Jenne</u>, 453 F.3d 1301, 1307 (11th Cir. 2006)).   Based upon the undisputed facts, no reasonable jury could conclude that Novitas' alleged interference in any way prejudiced Feige, and thus Novitas' Motion is due to be granted as to Feige's interference claim.   See <u>Conage</u>, 2020 WL 7385326, at *6; <u>see also</u> <u>Diamond</u>, 677 F. App'x at 592.

## B. <u>Retaliation</u>

While Novitas does not dispute that its termination of Feige constitutes an adverse employment action, <u>see generally</u> Motion; Novitas Response, Novitas does contend that Feige failed to show any causal connection between her termination and her identified protected activity.   <u>See</u> Motion at 14-16. Additionally, Novitas asserts that Feige's intervening conduct, i.e., her violations of company policy, failure to report violations, and refusal to cooperate with Novitas' required investigation, severed any causal connection that may have existed.   <u>Id.</u> at 15.   Further, Novitas argues that even if Feige could meet the first step of the <u>McDonnell Douglas</u> burden-shifting framework by stating a prima facie retaliation claim, her conduct constitutes a legitimate,

---

Thus, Penaloza cannot show that she was denied any benefit to which she was entitled under the FMLA.").

non-retaliatory reason for her termination.  Id. at 16-17.  Feige responds by arguing that a "close temporal nexus" existed between her protected activity and her termination sufficient to demonstrate causation, see Response at 18, and that Novitas' proffered reason for terminating her was merely pretextual, see id. at 18-20.

### i.    Causation

To satisfy the causal connection requirement of her prima facie case, Feige "need only show that the protected activity and the adverse action were not wholly unrelated." Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (internal quotation marks omitted).  Moreover, close temporal proximity between the employee's protected conduct and the adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact as to the element of causation.  Id.  Indeed, the Eleventh Circuit has held that "a period as much as one month between the protected expression and the adverse action is not too protracted." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).  However, "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Hankins v. AirTran Airways, Inc., 237 F. App'x. 513, 520 (11th Cir. 2007).  Despite a close proximity in time between two events, evidence of a "flagrant act of misconduct" in between the events can break the

causal connection between them.  Id. at 521; see also DeLeon v. ST Mobile Aerospace Eng'g, Inc., 684 F. Supp. 2d 1301, 1325 (S.D. Ala. 2010) ("The Eleventh Circuit has made clear that . . . a plaintiff's intervening act of misconduct severs the causal connection between the employee's [protected activity] and the decision to terminate her employment."); Martinez v. Workforce Cent. Fla., No. 6:06-cv-1062-Orl-28KRS, 2008 WL 1806119, at *8 (M.D. Fla. Apr. 21, 2008) (the intervening misconduct "severed whatever inference of causation arose from the temporal proximity").[26]

Novitas terminated Feige on February 28, 2019, nearly four months after she exhausted her statutory FMLA leave on October 30, 2018, and over six months after the July 23 Letter.  Feige has pointed to no authority suggesting that a temporal range of roughly four months between protected activity and an adverse employment action is sufficiently close as to constitute circumstantial evidence that creates a genuine issue of material fact on the causation element.[27]  See generally Response.  And, the authority cited by

---

[26]  But see Gross-Jones v. Mercy Medical, 874 F. Supp. 2d 1319, 1343-45 (S.D. Ala. 2012) (the intervening misconduct does not break the prima facie showing of a causal connection established by close temporal proximity, but rather provides a legitimate non-retaliatory reason for the employment action).

[27]  Nor did Feige identify any such authority during the Motion Hearing. However, the Court notes that during the Motion Hearing Feige's counsel initially appeared to argue that Feige's February 25 Email to Jamillah Haynes constitutes protected activity such that her termination three days later gave rise to an inference of causation based on close temporal proximity.  Nonetheless, when asked by the Court whether it was Feige's position that this email constituted protected activity, Feige's counsel clarified "[n]o, I actually think it all kind of goes together."  Id.

Novitas suggests the opposite.   See Motion at 14-15 (citing Penaloza v. Target Corp., No. 8:11-CV-2656-T-33AEP, 2012 WL 6721011, at *15 (M.D. Fla. Dec. 27, 2012), aff'd, 549 F. App'x 844 (11th Cir. 2013); and Drago, 453 F.3d at 1308 (concluding that a period of three months is insufficient to create a jury issue on causation).

Novitas also argues that "Feige's intervening misconduct broke any causal connection that might have been inferred between her protected activities and her termination."   Id. at 15.   In this regard, Novitas identifies several instances of misconduct: namely, Feige's violation of company policies by exchanging unencrypted communications likely containing PHI using personal devices and her accompanying failure to report the violations to Novitas as required, and her refusal to cooperate with Novitas' required investigation into the potential exposure of PHI.[28]   Id.   As Novitas explained in the Termination Letter, such conduct constituted violations of company policy and hindered Novitas' ability to comply with its obligations to keep protected patient information confidential.   See Termination Letter.   As

---

Therefore, based on Feige's counsel's representation, the Court will not consider whether the February 25 Email qualifies as protected activity for purposes of her FMLA retaliation claim.

[28]      In her Response, Feige does not address Novitas' intervening conduct argument as to the causation element beyond making cursory assertions that temporal proximity establishes a causal connection and pointing to her representation in her second declaration that "significant instances of retaliation . . . are causally related to protected activity undertaken by me requesting FMLA leave and exercising my rights under the FMLA."   See Response at 17-20; 3/2 Feige Dec'l ¶ 35.

discussed below with regard to Feige's claim of pretext, Novitas is likely correct that the undisputed evidence of Feige's violations of company policy would sever any inference of a causal connection that might arise from the four month temporal connection in this case.   See Hankins, 237 F. App'x at 520-21 (a plain violation of employee policies severs the causal connection).   But, the Court need not address the issue further because, even assuming Feige has presented sufficient evidence for a prima facie case of retaliatory termination, her claim fails because on the undisputed record she cannot show a genuine dispute on the issue of pretext.

> ### ii.   Pretext

Novitas maintains and has presented evidence that it terminated Feige due to her unsecure exchange of voluminous text messages containing confidential company and Medicare patient information using her personal cell phone, her unauthorized access of company information, her refusal to participate in the required "System Security Investigation" and related refusal to provide an export of the offending text messages from her personal cell phone, her failure to stop McCarty from sending the offending text messages and failure to report the text messages pursuant to company policy, and her unencrypted disclosure of the text messages to an unauthorized third party who

again transmitted the text messages to another party.[29]  <u>See</u> Termination Letter; <u>see also</u> Motion at 13.   Thus, even assuming, arguendo, that Feige satisfied the first step of the <u>McDonnell Douglas</u> burden-shifting framework, to prevail she must establish that Novitas' proffered reasons for terminating her are pretextual.  <u>See</u> <u>Raspanti v. Four Amigos Travel, Inc.</u>, 266 F. App'x 820, 822 (11th Cir. 2008).

"In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."  <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1037 (11th Cir. 2000).   "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."  <u>Raspanti</u>, 266 F. App'x at 824 (quoting <u>Chapman</u>, 229 F.3d at 1030).   "It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [the adverse action] was pretextual."  <u>Rioux v. City of Atlanta, Ga.</u>, 520 F.3d 1269, 1278 (11th Cir. 2008) (citing <u>Chapman</u>, 229 F.3d at 1024-25).   Therefore, the

---

[29]    With this evidence, the Court finds that Novitas has satisfied its "exceedingly light" intermediate burden of production under <u>McDonnell Douglas</u> by articulating a legitimate non-retaliatory reason for terminating Feige.  <u>See</u> <u>Deneve v. DSLD Homes Gulf Coast, LLC</u>, No. 20-13844, 2021 WL 2026616, at *3 (11th Cir. May 21, 2021) (quoting <u>Turnes v. AmSouth Bank, NA</u>, 36 F.3d 1057, 1061 (11th Cir. 1994) ("The "employer's 'intermediate burden is exceedingly light.'")).

plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Independent School System, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted). Nevertheless, the Court does not sit "as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting Chapman, 229 F.3d at 1030). Notably, a reason is not pretext for retaliation unless it is shown both that the reason was false, and that retaliation was the real reason. Suchite v. Kleppin, 819 F. Supp. 2d 1284, 1295 (S.D. Fla. 2011) (citing Brooks v. County Com'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006)).

Upon review of the record, the Court finds that Feige has failed to meet her burden of showing that Novitas' proffered reasons for terminating her were pretext for retaliation. During her deposition, Feige conceded that by refusing to participate in Novitas' mandatory disclosure investigation, she "probably" violated Novitas' compliance and ethics policy. See Feige Dep. at 116. Further, she agreed that her receipt of a particular communication from McCarty would "probably" have been a violation of company policy, and testified

that she understood her termination to be a result of her exchange with McCarty text messages containing confidential patient information.   See id. at 11, 188.   Although Feige appears to disagree with Novitas' conclusion that she refused to participate in the mandatory disclosure investigation, see 3/2 Feige Dec'l ¶ 34, and generally disagrees with Novitas' findings concerning the disclosure investigation, id. at 34, 36, Feige has not pointed to any evidence that undermines Novitas' conclusions about her conduct.[30]   Indeed, Feige concedes that Novitas was required to conduct the disclosure investigation, see Feige Dep. at 57, and concedes that she never spoke to Haynes as part of the investigation, see id. at 59-60, 107.   Even viewing all of the evidence in the light most favorable to Feige as the nonmovant, the Court finds that she has failed to point to any evidence suggesting that Novitas did not have a good faith belief that she had violated company policies by exchanging confidential company and patient information via unsecured channels on personal devices, failing to stop McCarty from sending such communications and failing to report the exchange, accessing company information without authorization, refusing to participate in the PHI disclosure investigation, and/or disclosing

---

[30]   The Court notes that Feige's deposition testimony that she did not participate in Novitas' disclosure investigation, contradicts her subsequent representations in her second declaration that she did not refuse to participate in the investigation, c.f. Feige Dep. at 59-60, with 3/2 Feige Dec'l ¶¶ 33-34.   However, even crediting Feige's latter representation, she admitted during her deposition that her failure to answer Haynes and Gray's phone calls at the designated times would have appeared to be a refusal to participate in the mandatory investigation.   Id. at 60.

unencrypted confidential communications to an unauthorized third party.[31] "[T]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance." Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) (abrogated on other grounds by Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019)); see also Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1148 (11th Cir. 2020) (citations omitted) ("[t]he inquiry . . . centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head"). Although Feige appears to believe that some of her actions did not violate Novitas' policies, the FMLA, like Title VII of the Civil Rights Act, "does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) (abrogated on other grounds by Lewis, 918 F.3d 1213).

In the Response, Feige primarily relies on her cursory temporal proximity argument in an attempt to rebut Novitas' proffered reason for terminating her.

---

[31]     The Court's review of the sealed August 2017 to September 2017 Unredacted Extraction Report containing the text messages exchanged between Feige and McCarty unequivocally confirms that the communications contained information sufficient to give rise to Novitas' good faith belief that they contained PHI. See e.g. August 2017 to September 2017 Unredacted Extraction Report (Doc. 62) at 274 (patient name and date of birth), 277 (patient name, date of birth, and medications), 281 (patient name and medications), 285 (patient name, date of birth, social security number, diagnosis, and medical procedures performed).

See Response at 18-20.   However, even assuming that there exists a sufficiently close temporal proximity between her identified protected activity and subsequent termination, Feige points to no authority suggesting that temporal proximity, alone, is enough to rebut Novitas' rationale for terminating her.  Id.  Indeed, the opposite appears true.  See Rossetti v. Rose Grp., No. 3:16-CV-1357-J-34JRK, 2018 WL 6204915, at *9 (M.D. Fla. Nov. 27, 2018) (citing Hurlbert, 439 F.3d at 1298, and Daugherty v. Mikart, Inc., 205 F. App'x 826, 827 (11th Cir. 2006) (per curiam)) ("[T]he Court notes that while close temporal proximity is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection, for purposes of determining whether a plaintiff has established a prima facie case, it is probably insufficient to establish pretext by itself.") (internal quotation marks omitted); see also Cabrera v. Town of Lady Lake, Fla., No. 5:10-CV-415-OC-34PRL, 2013 WL 12092573, at *25, n.30 (M.D. Fla. Mar. 28, 2013), aff'd, 556 F. App'x 801 (11th Cir. 2014) (citing Hurlbert, 439 F.3d at 1298) (finding that temporal proximity alone is insufficient to rebut an employer's legitimate proffered reason for termination).   For other evidence of pretext, Feige points to her representation in her second declaration that "[Novitas'] proffered reasons are merely pretextual for Defendant's termination of [her] as a result of availing [herself] to [sic] and utilizing FMLA leave to which [she] was entitled."   3/2 Feige Dec'l ¶ 36.   However, her assertion is nothing more than

her own legal conclusion and does absolutely nothing to meet Novitas' proffered reasons head on and rebut them.   See Raspanti, 266 F. App'x at 824 (quoting Chapman, 229 F.3d at 1030).

During the Motion Hearing, Feige argued that Novitas had notice through Carter in 2017 that McCarty was communicating with Feige while Feige was on FMLA leave—yet Novitas neither investigated McCarty nor subjected her to adverse employment action.   In particular, Feige contends that because she lacked access to Novitas' computer systems, she was thus unable to use secure channels to communicate with McCarty concerning work-related confidential patient information, and therefore Novitas must have known that she was exchanging PHI using personal devices even in 2017.   Id. However, as noted above, while Carter knew that McCarty had contacted Feige about work-related matters, even viewing the record in the light most favorable to Feige, there exists no evidence to suggest that Novitas knew of the contents of any such communications, i.e., Novitas had no knowledge of any potential disclosure of PHI to trigger its obligation to investigate.   See Carter Dep. at 28-30, 33, 38-40, 56-57; see also McCarty Dep. at 24, 48; Hicks Dep. at 26-29.   The record reflects that it was not until Owen's review of the incomplete transcript of text messages in February of 2019 that anyone at Novitas knew that confidential patient information had potentially been exposed.   Owen Dec'l ¶ 13-14.   And since McCarty had resigned her employment with Novitas in 2017,

Novitas had no reason to investigate her or take adverse employment action against her in 2019.   Moreover, even assuming that Novitas had knowledge of the potential PHI disclosure in Feige and McCarty's communications as early as 2017, such knowledge would serve to cast doubt on only a portion of Novitas' proffered reason for terminating Feige.   In other words, even if Novitas should have investigated both Feige and McCarty in 2017, after attempting to conduct the mandatory disclosure investigation Novitas concluded that Feige refused to participate after having been given ample opportunity to do so.   Critically, Feige has done nothing to meet this reason head on and rebut it.   <u>Raspanti</u>, 266 F. App'x at 824.   Feige herself conceded during her deposition that aspects of her conduct "probably" would appear to be violations of Novitas' policies.   <u>See</u> Feige Dep. at 116, 188.   Additionally, Feige's termination in 2019 was not the first time she had received notice that she had violated a company policy, indeed, in November of 2017 Carter counseled Feige regarding her improper transmission of patient information to her personal email.   <u>See</u> Carter Dep. at 43; <u>see also</u> Feige Dep. at 19-20.   Further, her general denials that she refused to participate in the investigation and that her communications with McCarty contained patient information amount to nothing more than a scintilla of evidence which does not create an issue of fact precluding summary judgment in Novitas' favor.   <u>Kesinger</u>, 381 F.3d at 1247.   And because the incomplete transcript provided by Feige's counsel to Novitas contained protected patient

information, Feige has failed to rebut Novitas' additional reason for her termination – her unencrypted disclosure of confidential company information to a third party (her attorney) who transmitted the information to another party.   Thus, the Court concludes that Feige has not shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Novitas' legitimate reason for her termination such that a reasonable jury could find it unworthy of credence.   <u>Vessels</u>, 408 F.3d at 771.   Moreover, upon consideration of the record, the Court determines that Feige has not presented evidence that retaliation was Novitas' real reason for terminating her. <u>Suchite</u>, 819 F. Supp. 2d at 1297 (granting summary judgment because plaintiff failed to present evidence that the real motivation was retaliation).   Therefore, even assuming that Feige has satisfied the causation element for purposes of the first step of the <u>McDonnell Douglas</u> framework, she has nonetheless failed to satisfy the third step, and summary judgment is due to be granted in Novitas' favor on Feige's FMLA retaliation claim.

**VI.   <u>Conclusion</u>**

Upon review of the record, the Court concludes that, as to Feige's interference claim, no reasonable jury could return a verdict in her favor because she failed to present any evidence that she suffered prejudice or incurred recoverable damages as a result of Novitas' actions.   Thus, this claim fails.   And her retaliation claim fails as well because Feige has not identified

any genuine dispute of fact to be resolved by a jury at trial.   Novitas' Motion is therefore due to be granted and summary judgment entered in its favor in this case.

Accordingly, it is

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. 38) is **GRANTED**.

2. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Novitas Solutions, Inc. and against Plaintiff Amy Feige.

3. The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 4th day of January, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

lc27
Copies to:
Counsel of Record